http://www.va.gov/vetapp16/Files4/1630414.txt

Citation Nr: 1630414 
Decision Date: 07/29/16 Archive Date: 08/04/16

DOCKET NO. 10-24 547 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas

THE ISSUES

1. Entitlement to service connection for post-operative hammer toe of the 5th toe of the right foot. 

2. Entitlement to service connection for left eye uveitis and photophobia. 

3. Entitlement to an evaluation in excess of 30 percent for primary insomnia.

REPRESENTATION

Appellant represented by: Disabled American Veterans

WITNESS AT HEARING ON APPEAL

Veteran

ATTORNEY FOR THE BOARD

P. Wirth, Associate Counsel

INTRODUCTION

The Veteran served honorably on active duty in the United States Army from June 1976 to June 1997. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a March 2009 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas. 

The Veteran testified before the undersigned in May 2013. A transcript of the proceeding has been associated with the claims file.

Additional medical evidence was associated with the claims file after the May 2014 Supplemental Statement of the Case. In June 2014, the Veteran submitted additional private treatment records. However, the Veteran waived his right in May 2014 to have his case remanded to the agency of original jurisdiction (AOJ) if he submitted evidence at a later time. In May 2015, pertinent VA treatment records from May 2014 to May 2015 were associated with the claims file. Neither the Veteran nor his representative has provided a written waiver of initial review by the AOJ of this evidence obtained by VA. Nonetheless, as the Veteran's increased rating claim is being remanded, the AOJ will have an opportunity to review such newly received records in the readjudication of his claim. 38 C.F.R. § 20.1304(c) (2015).

In its November 2013 remand, the Board noted that the issue of entitlement to service connection for adjustment disorder with depressed mood as secondary to service-connected primary insomnia/dyssomnia was raised by the record, and referred the issue to the AOJ for adjudication. However, the Board's review of the case shows that the issue has not yet been adjudicated by the AOJ. Therefore, the Board does not have jurisdiction over it and it is again referred to the AOJ for appropriate action.

The issue of entitlement to an evaluation in excess of 30 percent for primary insomnia is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).

FINDINGS OF FACT

1. Hammer toe of the right 5th toe and condylectomy of the right 4th toe are etiologically related to symptomatology noted in service. 

2. Left eye uveitis and photophobia had their onset during the Veteran's military service. 

CONCLUSIONS OF LAW

1. The criteria for service connection for hammer toe of the right 5th toe and condylectomy of the right 4th toe have been met. 38 U.S.C.A. §§ 1110, 1131, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

2. The criteria for service connection for left eye uveitis and photophobia have been met. 38 U.S.C.A. §§ 1110, 1131, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) and implementing regulations impose obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.326(a) (2015). In the present case, the Board is granting the claims for service connection for hammer toe of the 5th toe of the right foot and 
left eye uveitis and photophobia. This decision constitutes a full grant of the benefits sought on appeal; therefore, no further discussion regarding VCAA notice or assistance duties is required.

Laws and Regulations 

Under the relevant laws and regulations, service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C.A. § 1131; 38 C.F.R. § 3.303(a)(2015). Generally, service connection for a disability requires evidence of: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred in or aggravated by service. See Holton v. Shinseki, 557 F.3d 1363, 1366 (Fed. Cir. 2009).

Determinations as to service connection will be based on review of the entire evidence of record, to include all pertinent medical and lay evidence, with due consideration to VA's policy to administer the law under a broad and liberal interpretation consistent with the facts in each individual case. See 38 U.S.C.A. § 1154(a)(West 2014); 38 C.F.R. § 3.303(a). When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the claimant prevailing in either event, or whether a preponderance of the evidence is against the claim, in which case, the claim is denied. As with all claims, when there is an approximate balance of positive and negative evidence regarding any matter material to the claim, the claimant shall be given the benefit of the doubt. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. 

Analysis

Hammer Toe of the 5th toe of the Right Foot

With respect to the claimed right foot disability, the Veteran testified that he ran and trained in boots for many years in-service, and that he now has right foot "bone spurs" and a hammer toe (status-post surgical procedure) with residual, painful scarring as a result. The Board notes that the Veteran is currently service connected for callus/corn of the right 5th metatarsal. 

Service treatment records dated in December 1992 reflect objective findings of a moist, cracking lesion between the 4th and 5th toe on the right foot, and a callus on the 5th right metatarsal head. The pertinent diagnosis was tinea pedis and callus. In March 1993, the Veteran complained of pain between his 4th and 5th digit on the right foot; objectively, the right foot was tender, with thickened whitish tissue and several black spots on the 5th toe. The impression was a wart on the right foot. In May 1993, the Veteran again complained of right foot problems, and specifically, that it hurt to wear boots, walk, or run. He also complained of irritation between the great toe and 2nd toe. In June 1993, the Veteran was treated for a "recurrent fungal infection" of the right foot and painful growth in the web space. In October 1994, the Veteran complained of corns on his right foot, a hard mass in between his toes, and pain while walking (of a degree that it interferes with normal duty). The diagnosis was status post debridement of soft corn on right foot. In August 1995, the Veteran complained of right foot pain. Objectively, the dorsolateral aspect of the right foot was tender to palpation. The diagnostic impression was right foot overuse syndrome. The February 1997 separation Report of Medical History indicates "foot trouble," although the contemporaneous Report of Medical Examination indicates a normal evaluation of the feet. 

Following service, an April 1997 VA general examination reflected a recurrent soft corn on the right foot (medial), which had been previously trimmed by a podiatrist. A May 2000 VA podiatry note reflected a diagnosis of "right foot with skin breakdown occurring at webbed space." The Veteran complained of recurring problems with his feet. A June 2000 VA skin examination showed complaints of itchy blisters on the plantar aspects of both feet (onset 1991), a subsequent corn, and continued problems with both feet. Current symptoms included blistering, itching, and a very sore "corn" on the right 4th toe web. The pertinent diagnoses included plantar tinea pedis, interdigital tinea pedis, and granuloma fissuratum of the right 4th toe web. A January 2001 VA podiatry note showed the Veteran reported a painful corn between his right 4th and 5th toes. 

In August 2001, the Veteran presented to a private podiatrist, Dr. M., with complaints of a bone spur, right 5th toe. He also stated that he had had a corn for the last 13 years. Objectively, there was a hammer toe deformity of the right 5th, with hypertrophied head of the right 5th proximal phalanx, as well as a bone palpated. The diagnosis was helolomali with underlying bone abnormality. Surgical correction of the hammer toe was discussed. 

In September 2001, the Veteran underwent a surgical procedure for hammer toe revision, right fifth toe, and condylectomy of the right fourth toe. See Metroplex Hospital Operative Records. 

A March 2002 VA foot examination reflects a history of corns and a hammertoe deformity of the right foot (status post-surgical repair). X-rays of the right foot demonstrated minimal hallux valgus and status-post osteotomy, distal aspect of proximal phalanx of the 5th right toe/foot. Diagnoses included callus, right 5th toe, and status post- repair hammer toe deformity with residual loss of range of motion in the 5th toe with residual tinea pedis. 

VA treatment records dated in 2008 reflect complaints of right foot pain, status post hammer toe deformity surgery. A January 2008 x-ray of the right foot showed pes planus, but no acute fractures or abnormalities were appreciated. 

September 2013 private treatment records, received in December 2013, show the Veteran saw a podiatrist, Dr. L., and reported pain in the right 5th toe. He stated that he had had hammer toe repair and got significant pain relief, but he was now starting to have pain in that area. He had been told in the past by several doctors that he had bone spurs. On examination, the right 5th toe was rectus. A bony prominence was noted on the medial aspect of the proximal interphalangeal joint. There was no pain with 5th metatarsophalangeal joint range of motion. X-ray reports show no acute osseous findings. However, Dr. L. noted that x-rays reveal a prominent condyle at the medial aspect at the base of the middle phalanx of the right 5th toe. The impression was exostosis of the medial phalanx 4th toe and foot pain. (Exostosis is defined as "a benign bony growth projecting outward from the surface of a bone." See Dorland's Illustrated Medical Dictionary 660 (32nd ed. 2012).) 

At a January 2014 VA examination, the Veteran reported the onset of right foot pain in service due to excessive wearing of boots. He reported the pain as constant. On examination, a scar of the right 4th web space measuring 1.25 centimeters x 0.6 centimeter was noted. It was not painful or unstable. The examiner's findings were that the hammer toe of the right 5th toe was corrected without residuals, there were no bone spurs, and condylectomy of the 4th web space with residual tenderness. The examiner noted that x-rays from January 2007 reported a normal right foot and no bone spurs. (As the Board is unable to find January 2007 x-rays of record, it is believed a typographical error occurred and the examiner was referring to January 2008 x-rays.) The examiner opined that wearing boots during service exerted pressure on the right 5th toe causing a hammer toe to develop; however, the hammer toe was corrected with only a non-tender scar as a residual. The examiner opined further that it is less likely than not that the Veteran's service-connected callus of the right 5th metarsal caused the hammer toe of the right 5th toe. The examiner explained that the calluses were constantly debrided, and later the Veteran debrided them himself.

A June 2014 VA podiatry note shows the Veteran reported pain in his right foot between his toes. He reported a long history of such pain and receiving a steroid injection over a year ago with positive results that lasted for months. He was provided a steroid injection to the right foot at the 4th to 5th interdigital space. 

As the January 2014 examiner opined that wearing boots during service exerted pressure on the Veteran's right 5th toe causing a hammer toe to develop which was corrected with a scar as a residual, service connection for post-operative hammer toe of the 5th toe of the right foot is warranted. In addition, the Board also finds that service treatment records, post-service medical records, and lay reports from the Veteran show onset in service and continuance after service findings associated with the right 4th toe and web space ultimately diagnosed as condyle of the right 4th toe. Accordingly, service connection is also warranted for condylectomy of the right 4th toe.

Left Eye Uveitis and Photophobia

With respect to the left eye, the Veteran testified that he started having eye problems in 1988 while he was a drill sergeant at Fort Bliss. He stated that he was exposed to heat and sand in that capacity, which resulted in corneal scarring. He stated that he also became photophobic around this time; he reported that he has had to wear dark sunglasses since service due to this condition. In addition to the photophobia, the Veteran testified that he was treated for inflammation of the left eye while on active duty and that he was subsequently treated for the same symptoms after service and ultimately diagnosed with uveitis. He contends that the uveitis has damaged his retina. The Board notes that the Veteran is currently service connected for corneal scarring of the left eye. 

Service treatment records (STRs) dated in December 1978 show complaints of decreased visual acuity. A January 1993 STR reflects complaints of an itchy left eye with draining and a diagnosis of "R/O conjunctivitis." STRs dated in December 1993 reflect that the Veteran was "photophobic" and wore sunglasses for this condition. There was also a history of left corneal scarring. Retirement examination dated in February 1997 indicated distant left eye vision of 20/80 (-1) and 20/20 (-1), corrected; and near left eye vision of 20/20 (-1), and 20/20 (-2), corrected. 

Following service, an April 1997 VA general examination confirmed left eye corneal scarring. An October 1999 Eye Clinic note shows complaints of left eye soreness, with an abrasion on the cornea. A January 2000 VA Eye Clinic note shows subjective complaints of "retinal scars" from outside work at Fort Bliss. Objectively, the examiner observed signs of apparent solar retinopathy. A June 2000 VA eye examination included subjective complaints of corneal scarring due to standing in the sun during service. Objectively, there was a very small scar in the left cornea. No other pertinent findings were noted upon examination. 

Private ophthalmological treatment records dated from 2000 to 2001 show complaints of decreased vision; the Veteran underwent eye surgery during this time period. 

An April 2002 VA eye examination shows that the Veteran complained of having photophobia since serving in the El Paso desert. He stated that he has to wear sunglasses constantly. Objectively, there was pigmentation around the fovea. The diagnosis was photophobia secondary to extreme light exposure in desert duty. 

A May 2007 private treatment report reflects a diagnosis of left eye iridocyclitis and complaints of eye redness and difficulty opening eye. A September 2007 private examination report showed complaints of visual impairment in the left eye with blurring and photophobia in May 2007. The assessment was history of possible conjunctivitis/iritis. 

The Veteran was diagnosed with left eye uveitis and cystoids macular edema in March 2008. See Eye Institute of America Records. He also underwent cataract surgery for the left eye in 2008. December 2008 treatment records show diagnoses of recurrent left eye iritis and complaints of irritation, redness, and swelling. 

A January 2009 VA examination (without claims file review) shows complaints of photophobia and decreased visual acuity in the left eye. The diagnostic assessment was recurrent iridocyclitis (left eye, severe, with unknown etiology), and steroid induced cataract, left eye. The examiner stated that, without access to the Veteran's claims file and military medical records, she would be "totally speculating on whether the photophobia which this Veteran has associated with his recurrent iritis is indeed the same cause of photophobia he has had since 1988 on active duty." She further noted that the Veteran did not have corneal scars, but did have keratic participants all over the left eye cornea. Additionally, the examiner stated that she has seen patients treated for years with antibiotics for recurrent "pink" eye, who were "finally" diagnosed with recurrent iritis. She concluded "this could very well be the case with the Veteran, but [she] would be making a more educated guess if [she] could review his military records." The RO subsequently requested an addendum opinion to the January 2009 VA examination but did not receive one.

The Veteran was afforded a VA examination in January 2014 in connection with his claim for service connection of left eye uveitis and photophobia. The examiner diagnosed the Veteran as having chronic uveitis, epiretinal membrane status post surgical peeling, and cataract of the left eye status post extraction. The examiner remarked that "[t]here was mention of corneal scarring referred to in the [service treatment records], but that was apparently an error, as it was later determined the examiner was seeing keratic precipitates associated with uveitis instead." 

The examiner opined that it is less likely than not that the Veteran's uveitis (iritis, iridocyclitis) was caused by exposure to sunlight, sand, dust, or by corneal scarring. The examiner's rationale is as follows:

The medical literature omits any mention of causative exposures to sun, sand or dust, or any association to such exposure, with respect to uveitis. In most cases the etiology of this inflam[m]atory condition remains obscure. Collagen vascular and autoimmune disorders are occasionally associated with this diagnos[is], but in this case thorough lab investigations have turned up no positive findings. Nor is there any reason to believe that a small superficial corneal scar is in any way logically related to chronic internal uveal tract inflammation. Furthermore, we must assume that it is unlikely that serial examinations by licensed optometrists and ophthalmologists could have misdiagnosed conjunctivitis or corneal abrasion, in the presence of clinical uveitis. Finally, evidence of chronic uveitis contra indicates LASIK surgery, and should have precluded the surgical procedure the veteran had in 1999. There is understanding among ophthalmic surgeons that a surgical procedure can potentially cause an inflammatory flare up. Accordingly, it is reasonable to assume that the veteran contracted iritis after 1999.

Based on the January 2014 VA examiner's finding that the corneal scarring referred to in service was actually keratic precipitates associated with uveitis, the Board finds that service connection is warranted for left eye uveitis. Indeed, the January 2014 VA examiner's findings are consistent with the January 2009 VA examiner's findings. Moreover, the examiner based his opinion, at least in part, on the notion that the Veteran underwent Lasik. A carefully review of the evidence, however, shows that the Veteran in fact had a surface photorefractive keratectomy (PRK) in June 2001, rather than Lasik. While both procedures involve a laser to correct vision, they are different procedures and may have different contraindications. Also, the Board finds that in light of service treatment records, post-service medical records, the Veteran's lay reports, and the January 2014 VA examiner's opinion, service connection should include photophobia. The Board is cognizant of recent VA treatment records that show the Veteran's chronic uveitis is due to Human Leukocyte Antigen (HLA) B27 thereby raising the issue of whether the Veteran's uveitis is a congenital defect or disease. Service connection may be granted for diseases, but not defects, of congenital, developmental, or familial origin. VAOGCPREC 82-90 (July 18, 1990); VAOPGCPREC 67-90 (July 18, 1990). In differentiating the two categories, VA's Office of General Counsel has stated that, when viewed in the context of 38 C.F.R. § 3.303(c) , the term "defects" would be definable "as structural or inherent abnormalities or conditions which are more or less stationary in nature." VAOPGCPREC 82-90. In contrast, a "disease" is referred to as a condition considered capable of improving or deteriorating. Id. Service connection is available for congenital diseases that first manifest in service or are aggravated in service. Service connection is not available for congenital defects, but service connection may be awarded for disease or injury that is superimposed upon the congenital defect during service. Quirin, 22 Vet. App. at 394; Monroe v. Brown, 4 Vet. App. 513, 515 (1993); VAOPGCPREC 82-90. Crucially, the Federal Circuit has held that a congenital, developmental, familial, or hereditary condition that is progressive in nature (i.e., which can worsen or improve over time) is a "disease process." O'Bryan v. McDonald, 771 F.3d 1376, 1380 (Fed. Cir. 2014). Thus, whether described as a defect or disease, the medical evidence of record shows the uveitis is capable of deteriorating, and so must be treated as a disease for VA purposes. Service treatment records and the January 2014 VA examiner's opinion show the condition first manifested in service thereby warranting service connection. 

ORDER

Service connection for hammer toe of the right 5th toe and condylectomy of the right 4th toe is granted.

Service connection for left eye uveitis and photophobia is granted. 

REMAND

Increased Rating for Primary Insomnia

Since the Veteran's last VA examination to evaluate his insomnia in January 2013, he underwent a VA sleep study in June 2014, which reveals diagnoses of mild positional obstructive sleep apnea/upper airway resistance and insomnia. The Veteran is using Continuous Positive Airway Pressure (CPAP) therapy to treat his sleep apnea. See March 2015 VA Sleep Medicine Note. 

Given the new diagnosis of sleep apnea and that it has been more than three years since his last examination, the Board finds a VA examination is necessary to determine the Veteran's current status, evaluate his response to CPAP therapy, and attempt to reconcile his symptoms with the various recent diagnoses documented in his VA treatment records, including insomnia, circadian sleep disorder, shift work sleep disorder, dyssomnia, daytime hypersomnolence, major depressive disorder, and adjustment disorder with depressed mood.

All relevant ongoing VA and private medical records should also be requested on remand. 38 U.S.C.A. § 5103A(c) (West 2014); see also Bell v. Derwinski, 2 Vet. App. 611 (1992). 

Accordingly, the case is REMANDED for the following action:

1. Contact the Veteran and request that he provide the names and addresses, with approximate dates of treatment, of all medical care providers, VA and non-VA, who have provided any treatment to him for insomnia since January 2013. If signed authorizations are received from the Veteran, obtain all private treatment records that previously have not been obtained. A copy of any records obtained, to include a negative reply, should be included in the claims file.

If efforts to obtain any identified records are unsuccessful, the Veteran must be informed of the missing records, the efforts made to obtain them, and of further actions that will be taken.

2. Obtain all VA treatment records that have not been associated with the Veteran's claims file. 

3. After the development in paragraphs 1 and 2 above has been completed, schedule the Veteran to be examined by a VA examiner with sufficient expertise to determine the current symptoms and severity of his service-connected primary insomnia. The VA examiner is asked to thoroughly review the claims file, as well as a copy of this Remand. The examiner should note in the VA examination report that this review has been accomplished. Any tests and studies deemed necessary should be conducted. All findings should be reported in detail.

The examiner is requested to state, to the extent feasible, the Veteran's symptoms that are attributable to his service-connected primary insomnia, as opposed to other diagnoses such as sleep apnea, depression, and/or adjustment disorder. The examiner is also requested to comment on the Veteran's response to CPAP therapy, including whether it has reduced the presence or intensity of any of his symptoms.

All opinions provided must be thoroughly explained, and an adequate rationale for any conclusions reached must be provided. If the examiner believes that an opinion cannot be provided without resorting to speculation, then he/she must provide a detailed medical explanation as to why this is so.

4. Readjudicate the claim after the development requested above has been completed. If any benefits sought on appeal remain denied, the Veteran and his representative should be furnished with a supplemental statement of the case and be given the opportunity to respond thereto. The case should then be returned to the Board for further appellate consideration, if in order. 

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

(CONTINUED ON NEXT PAGE)

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
TANYA SMITH
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs